Filed 8/4/26  A Company Hungary KFT v. Bespalov CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| A COMPANY HUNGARY KFT, | B336640 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. 20STCV00175) |
| SERGEI BESPALOV  et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephanie M. Bowick, Judge.  Affirmed.

Eisner, Jeremiah Reynolds, Zachary Elsea for Defendants and Appellants.

Meister Seelig & Fein, Alexander D. Pencu, Michael B. Sloan; Chassman and Mark B. Chassman for Plaintiff and Appellant.

## INTRODUCTION

Plaintiff A Company Hungary, Kft (A Company Hungary) purchased the rights to distribute a movie, *Sin City II: A Dame to Kill For*, in various Eastern European countries, including Russia. A Company Hungary subsequently signed a letter directing that the revenues from the Russian release of *Sin City II* be held in an account controlled by non-party Aldamisa Rus LLC (Aldamisa Rus). After receiving the money, Aldamisa Rus transferred it to various other parties, and most of it ended up in the possession or control of the defendants, Sergei Bespalov and Marina Bespalov. A Company Hungary sued the Bespalovs, claiming it retained rights to at least some of the money; the Bespalovs claimed A Company Hungary surrendered all rights by directing the funds to Aldamisa Rus. The trial court agreed with A Company Hungary, and for the reasons given below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2012, A Company Hungary purchased the Eastern European distribution rights to *Sin City II* from Sartraco, Inc. (Sartraco) The purchase included the rights to distribute the film in theaters, via pay-per-view, on television, in hard copy, and over the internet. The price was $4,000,000, payable in three installments of $800,000 due at signing, $2,000,000 due on "Notice of Delivery,"[1] and $1,200,000 due three months after Notice of

---

[1] The contracts contain no definition of this term. They do, however, refer to a "Notice of Initial Delivery" which is a document providing the buyer (A Company Hungary) with more detailed information about how, when, and in what format the movie will be delivered. Sergei Bespalov testified at trial that the Notice of Delivery is typically provided when the movie is finished and has been placed in custody of an intermediary whose job is to ensure that payments are made.

Delivery. The purchase agreement was signed by Marina Bespalov on behalf of Aldamisa International, LLC (Aldamisa International), the corporate agent for Sartraco.

I.    *The Distribution Structure*

In October 2013, A Company Hungary sold its distribution rights for the territory of Russia[2] to A-Company Film Licensing International GmbH (A Company Germany). The price was a flat fee identical to the amount A Company Hungary paid for the rights in the first place. A Company Germany in turn licensed the theater distribution rights to A Company Distribution (A Company Russia), which was to retain a commission of 11.5 percent of the gross receipts and return the remainder to A Company Germany. Finally, A Company Russia reached an agreement with Twentieth Century Fox CIS (Fox Russia) to book the movie in theaters and collect the revenue. Fox Russia was to collect a fee from those funds and send the remainder to A Company Russia.

In sum, Fox Russia was to collect the funds generated by Russian theater sales, take a fee, and pass the remainder to A Company Russia, which was then to take its commission and pass the remainder to A Company Germany.

II.    *The Letter*

Notice of Delivery was provided to A Company Hungary in the summer of 2014. As of August 1, 2014, A Company Hungary had only partially

---

[2]    Other territories were included in the sale, but the dispute here concerns only Russia.

3

completed the payments for the distribution rights. It still owed $1,149,292. On August 13, 2014, for reasons that are hotly disputed between the parties, A Company Hungary and A Company Russia signed a "Letter of Irrevocable Payment Instruction" (the Letter). The Letter directed Fox Russia to send all revenues from the cinematic release of *Sin City II* in Russia to a bank account held by Aldamisa Rus, which was an agent of Aldamisa International, rather than A Company Russia.

### III. *The Bankruptcy*

In February 2015, a few months after *Sin City II* was released, A Company Germany went bankrupt. A Company Hungary filed a creditor's claim in the bankruptcy proceedings. The bankruptcy administrator sent A Company Hungary a notice stating his refusal to fulfill the contracts related to *Sin City*.

### IV. *The Money*

A Company Russia challenged the validity of the Letter in Russian court; the litigation involved Fox Russia and Aldamisa Rus and lasted several years. It is undisputed that ultimately, in 2017, Fox Russia followed the Letter's instructions and paid $2,033,069 to Aldamisa Rus. Of that amount, $1,478,885 was wired to Aldamisa International, then to a company called Fortune Four, LLC (Fortune Four), which was owned by the Bespalovs. Once there, the funds were either transferred directly to personal accounts held by the Bespalovs or spent on their behalf. The remainder of the $2,033,069 went to pay counsel who represented Aldamisa Rus.[3]

---

[3]     The parties occasionally employ round figures, and it is not always clear which counsel received precisely what amount. However, it is not

4

V.    *This Lawsuit*

In January 2020, A Company Hungary filed suit against the Bespalovs, asserting three causes of action: conversion, civil theft under Penal Code section 496,[4] and unjust enrichment.  In their complaint, A Company Hungary alleges that neither Aldamisa Rus, nor Aldamisa International, nor either Bespalov, was entitled to claim the whole $2,033,069 in Russian theater proceeds.  A Company Hungary concedes Aldamisa Rus was entitled to retain sufficient money to cover the amount A Company Hungary still owed for the purchase of the distribution rights.  But A Company Hungary claims the remainder of the funds should have been returned.

The case was initially scheduled for a jury trial in December 2022; the trial court and counsel spent several days discussing motions in limine and other pretrial matters before turning to jury selection.  However, after the jury had been empaneled, opening statements had been made, and the examination of the first witness had begun, defense counsel and one of the jurors tested positive for Covid-19.  The parties stipulated to a mistrial.  Defense counsel subsequently withdrew and were replaced.  The parties then agreed to a bench trial.

The trial court held the bench trial in two phases: a liability phase running April 25-May 4 of 2023, and a punitive damages phase running September 7-11 of 2023.  The court issued a statement of decision in favor of A Company Hungary in December 2023.  The court found A Company

---

disputed that $1,478,885 was sent to Fortune Four as described, and that the remainder of the funds are gone.

[4]    All future statutory references are to the Penal Code, unless otherwise designated.

Hungary had standing to sue despite its assignment of distribution rights to A Company Germany because the original distribution contract was with A Company Hungary and all parties continued to behave as if A Company Hungary were the responsible entity. It found that neither the Bespalovs nor their companies had a contractual right to the money claimed by A Company Hungary. Further, it found the Bespalovs acted deliberately in taking the money.

Therefore, the court awarded A Company Hungary $795,708 in damages (the difference between the amount taken and the amount still owed for the distribution rights), and directed A Company Hungary to choose between $2,387,124 in statutory treble damages under section 496, subdivision (c), or $2,000,000 in punitive damages on the conversion claim. A Company Hungary elected treble damages.

Judgment was entered on January 23, 2024. The Bespalovs timely appealed. A Company Hungary timely cross-appealed.

## DISCUSSION

The Bespalovs raise three arguments on appeal: (1) they claim A Company Hungary failed to prove standing, and that the proper party to bring this lawsuit was A Company Germany, (2) they contend the judgment should be reversed as to the cause of action for civil theft because they were prevented from properly fleshing out their "good faith belief" defenses to that claim, and (3) they assert that this is at bottom a contract dispute and tort law should not apply. A Company Hungary cross-appeals from the trial court's order requiring it to make an election of remedies between punitive and treble damages – it argues it should recover both.

6

I.  *Standard of Review*

On appeal from a decision after a bench trial, we review the court's factual findings for substantial evidence, and its conclusions of law de novo. (*Lopez v. La Casa de Las Madres* (2023) 89 Cal.App.5th 365, 378.)  We view the evidence in the light most favorable to the judgment, drawing all reasonable inferences and resolving all conflicts in its favor.  (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581—582.)

We review the trial court's decisions to admit or exclude evidence for abuse of discretion.  (*People v. Mataele* (2022) 13 Cal.5th 372, 413—414.)  We reverse only where an appellant can show the trial court acted in an arbitrary, capricious, or absurd manner that led to a miscarriage of justice. (*Ibid.*)

II.  *Standing*

The trial court found A Company Hungary had standing to claim the money because it was the distributor, and everyone involved in these transactions, *including the Bespalovs*, treated it as the distributor.  A Company Hungary, A Company Germany, and A Company Russia were affiliates and shared at least one executive, Alexander Van Dulmen, who negotiated all these transactions and was the decisionmaker who ultimately placed A Company Germany into bankruptcy.  The court noted testimony from Van Dulmen that A Company Germany was only used to facilitate distribution for a brief time.

When the film was ready for distribution, the Notice of Delivery was directed to A Company Hungary, not A Company Germany.  When the Bespalovs wanted to obtain the Letter and redirect payment for the Russian cinematic revenue, they went to A Company Hungary and A Company

7

Russia, not A Company Germany. When the film was actually delivered for distribution, it was delivered to A Company Hungary. The agreements giving A Company Hungary the right to distribute the film remained in effect throughout the relevant period, and A Company Hungary continued to receive related invoices from Aldamisa International. Substantial evidence supports the trial court's findings that A Company Hungary was the distributor and that all relevant parties treated it as such.

As A Company Hungary points out, the Bespalovs' opening brief offers no discussion of these factual findings and no challenge to the court's rationale. We note in particular that neither the Bespalovs nor A Company Germany was a signatory to, or even named in, the Letter from A Company Hungary under which the Bespalovs ultimately claimed the money. The Bespalovs make no attempt to explain how A Company Hungary had the right to direct the money to Aldamisa Rus via the Letter, but no right to ask for it back. Instead, the Bespalovs focus solely on the bankruptcy of A Company Germany and the possible ways the contract between A Company Hungary and A Company Germany could be cancelled.

Because the judgments of the trial court are presumed correct, the Bespalovs bear the burden of demonstrating error in the trial court's findings or reasoning. (*Murchison v. County of Tehama* (2021) 69 Cal.App.5th 867, 882.) By failing to discuss the court's findings and rationale in their opening brief, they have failed to carry their burden. Although the Bespalovs discuss some of the court's points in their reply brief, that discussion comes too late. Appellants may not reserve necessary parts of their arguments for reply and thus deprive their opponents of a chance to respond. (*LAOSD Asbestos Cases* (2026) 118 Cal.App.5th 1041, 1069; see also *Doe v. California* (2009) 173 Cal.App.4th 1095, 1115.)

Because the Bespalovs failed to meet their burden in this manner, we need not discuss their arguments that A Company Germany was an indispensable party to this lawsuit, or that the case should be dismissed because A Company Hungary failed to offer an expert on German law to testify about A Company Germany's bankruptcy. Nor need we discuss the Bespalovs' somewhat incompatible argument that the trial court should have excluded all evidence of A Company Germany's bankruptcy.[5]

III.    *Civil Theft*

Section 496, subdivision (a), defines the criminal offense of receiving stolen property. It also specifies that any principal in the actual theft of the property may be convicted either of the theft, or of receiving stolen property, but not both. (§ 496, subd. (a).) Section 496, subdivision (c), authorizes anyone who has been injured by the receipt of stolen property to sue for treble damages, plus costs and attorney's fees.

To establish a violation of section 496, a plaintiff must prove there has been a theft as defined by section 484 (or some other section). (*Siry Investment, L.P. v. Farkhondehpour* (2022) 13 Cal.5th 333, 361—362 (*Siry*).) This includes proving the requisite level of intent by the alleged thief. (*Ibid.*)

The Bespalovs complain the trial court prevented them from negating the intent element by excluding evidence on three points: (1) the Bespalovs' belief that the litigation in Russia had resulted in an order awarding them

---

[5]    Initially, the court did exclude the bankruptcy, when the Bespalovs' previous counsel indicated an intent to use the bankruptcy to show that A Company Hungary and its affiliates were unreliable partners. However, the court reconsidered when the Bespalovs retained new counsel who indicated an intent to argue, for the first time, that A Company Germany was the party with standing to sue.

the money, (2) the Bespalovs' belief that A Company Hungary owed Aldamisa International $12 million from other projects, and (3) claims made by Van Dulmen, and A Company Russia in its own bankruptcy proceedings, that the money actually belonged to A Company Russia rather than A Company Hungary.

With the sole exception of their claims about a Russian court judgment, discussed below, the Bespalovs do not develop these arguments beyond a citation to *People v. Marsh* (1962) 58 Cal.2d 732 (*Marsh*). Relying on *Marsh*, the Bespalovs suggest it is "error to exclude evidence supporting a good faith belief defense where specific intent is a necessary element for a finding of liability." This misreads *Marsh*, and confuses the concept of error with the concept of prejudice.

In *Marsh*, the California Supreme Court concluded that a trial court improperly sustained hearsay objections to material that was not offered to prove the truth of the matter asserted, and therefore was not hearsay. (*Marsh, supra,* 58 Cal.2d at pp. 736—737.) The Court then concluded the error was prejudicial because the excluded material went to the heart of the defense case. (*Id.* at pp. 740—741.) The Bespalovs move to that second step while missing the first: it is their burden as appellants to explain why the evidence excluded by the trial court was admissible. At no point in their briefing do the Bespalovs attempt to show that the trial court's rulings were legally incorrect. The failure to offer any such legal argument forfeits the issue. (*Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 497—498.)

At trial, the Bespalovs attempted to introduce copies of a judgment and other orders from the Russian courts as exhibits 501 and 511. The trial court sustained objections to those exhibits under Evidence Code section 1530,

subdivision (a)(3), which governs the admission of copies of official documents from foreign governments.  The Bespalovs now argue that the 1961 Convention Abolishing the Requirement of Legalization for Foreign Public Documents (the Apostille Convention)[6] pre-empts Evidence Code section 1530.

Yet nothing in exhibit 501 appears to bear an apostille.  And the Bespalovs did not include exhibit 511 in their appellate appendix.  In their brief, they assert that they "presented a notary's certification . . . and an apostille," but there is no citation to the record indicating where these items might be found.  In the alternative, the Bespalovs suggest the court should have allowed them to authenticate the Russian documents through the testimony of Alexey Savostyanov, the Director of Aldamisa Rus and a Russian lawyer.  Yet they do not specifically explain how Savostyanov, who holds no official position with the Russian courts, would have been able to authenticate Russian court documents, or why the trial court's decision to forestall the attempt was an abuse of discretion.  The Bespalovs have failed to meet their burden of demonstrating that the trial court erred in excluding these documents.

IV.    *Tort Claims*

The Bespalovs argue that this is, at bottom, a simple contractual dispute over the meaning of the Letter that placed the Russian cinematic revenue in the hands of Aldamisa Rus.  They should prevail on a

---

[6]    An apostille is "[a] standard legal certificate attesting that the signatures, seals, or stamps are authentic on a public document used in a foreign country."  (Black's Law Dictionary (12th ed. 2024), apostille.)  The Apostille Convention prescribes a standard form for apostilles, to be used by all signatories.  (Apostille Convention, Article 4, Annex to the Convention.)

11

straightforward reading of the Letter, they claim, and there should be no tort issues. We are not persuaded.

The Bespalovs assert that because the Letter "unconditionally and irrevocably instructs [Fox Russia] to make all Payments to the following bank account . . . of Aldamisa Rus," it clearly relinquished A Company Hungary's right to the money. This argument fails because, as observed by the trial court, the Letter is not a contract signed by the Bespalovs or any of their entities. It is a direction about where distribution revenue is to go, with audit rights given to the original owner of the film, Sartraco – to whom A Company Hungary still owed part of the purchase price for the distribution rights.

The more natural reading of the Letter is that Aldamisa Rus was an agent to collect and hold the money, not the money's new owner. This reading is supported by an agency agreement signed by Aldamisa Rus and Aldamisa International, in which Aldamisa Rus agreed to help recover the outstanding amount owed by A Company Hungary for the distribution rights to *Sin City II*. It also comports with testimony given by Savostyanov that Aldamisa Rus was to collect the money and then distribute it "to those parties with a financial stake under the distribution agreements."

The Bespalovs argue the Letter is at least ambiguous, and that the ambiguity renders impossible any finding of intent to steal, as required for liability under section 496. But for this contention they rely entirely upon *Siry*, and *Siry* does not hold that an ambiguous contract always prevents the existence of the required intent. In *Siry*, the defendant was in default, and therefore the allegations of theft were deemed admitted. (*Siry, supra,* 13 Cal.5th at p. 361.) The Court paused to note that "not all commercial or consumer disputes . . . will amount to a theft," and observed that the

requirement of proving intent will prevent ordinary commercial disputes from being transformed into theft claims. (*Id.* at pp. 361—362.) Nothing in *Siry* suggests that a party cannot form the intent necessary for theft if a relevant document is ambiguous.

Finally, the Bespalovs point out that conversion claims cannot be raised over the mere contractual right to be paid (*Voris v. Lampert* (2019) 7 Cal.5th 1141, 1151—52) and suggest this lawsuit falls afoul of the economic loss rule, which requires courts to bar tort claims "in deference to a contract between litigating parties." (*Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal.5th 905, 922.) This argument fails because there is no contract between the litigating parties. A Company Hungary has no contractual relationship with Aldamisa Rus, Aldamisa International,[7] or the Bespalovs. Once the money passed into the control of Aldamisa Rus, A Company Hungary had no contractual means to regain control and no contractual remedy when the money was taken. Although Aldamisa Rus was intended to act as a holding agent, its formal principal and the only entity with a contract right to give instructions was Aldamisa International. When Aldamisa International claimed the money from Aldamisa Rus, and the Bespalovs then claimed it from Aldamisa International, tort remedies were all A Company Hungary had. It cannot be barred from seeking them.

V.     *Damages*

A Company Hungary challenges only one aspect of the court's decision: that awarding both punitive damages on the conversion claim and treble

---

[7]     Although Aldamisa International was a signatory on the original agreements when A Company Hungary purchased the distribution rights, Aldamisa International signed as the agent of the film's owner, Sartraco, not as a principal itself.

damages on the civil theft claim would constitute an improper double recovery. Again, we affirm.

Neither party disputes the rule to be applied here: a plaintiff may not recover statutory treble damages *and* punitive damages for conduct that is essentially the same. (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 759—760.) A Company Hungary argues the trial court misapplied the rule because the civil theft did not begin until "[a]fter the conversion was completed." According to A Company Hungary, the elements of conversion were completed when the Bespalovs took control of the money by having it sent to Aldamisa International, while the elements of civil theft were not completed until the Bespalovs took the money out of Aldamisa International and put it to their own use. Therefore, A Company Hungary contends, the conduct supporting the conversion claim was different than the conduct supporting the civil theft.

This distinction is too facile. A Company Hungary's complaint, in stating its claim for conversion, alleges the Bespalovs interfered with the money by "knowingly or intentionally taking possession of" it and refusing to give it back. In stating its claim for civil theft, the complaint alleges the Bespalovs "stole" the money and "have refused to return" it. The conversion and the theft both occurred when the Bespalovs took the money. A Company Hungary may not recover multiple times simply because taking the money required multiple transfers. Designating one transfer as the conversion and the next as the theft is purely arbitrary.

A Company Hungary relies on *Anderson v. Ford Motor Company* (2022) 74 Cal.App.5th 946, which awarded both punitive damages based on fraud prior to the sale of a Ford F-250 and statutory penalties for failure to replace the truck after warranty repairs were unsuccessful. (*Id.* at pp. 970—971.)

14

However, that case differs from this one in two obvious ways: the time frames were clearly discrete (pre-sale and post-sale) as were the theories themselves (fraud and lemon law). Here, conversion and civil theft were pled to provide alternate legal theories of liability for the same conduct. The trial court rightly determined it would be a double recovery to allow punitive damages under one theory *and* treble damages under the other.

## DISPOSITION

The judgment of the trial court is affirmed. Because there were cross-appeals and each was unsuccessful, each party shall bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ZUKIN, P. J.

We concur:


MORI, J.


TAMZARIAN, J.

15